___ FILED        ___ ENTERED
___ LOGGED       ___ RECEIVED

4:09 pm, Nov 05 2021
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO CELLPHONES CURRENTLY IN THE POSSESSION OF THE ATF BALTIMORE FIELD OFFICE IN BALTIMORE, MARYLAND | Case No. 1:21-mj-2899 TMD |
| IN THE MATTER OF THE AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT AUTHORIZING A DNA SAMPLE COLLECTION FROM ULYSSES JACKSON | Case No. 1:21-mj-2900 TMD |

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT**

I, Anthony Petrella, Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, depose and state as follows:

**I.    PURPOSE OF THIS AFFIDAVIT**

1. The ATF and Baltimore Police Department ("BPD") have been investigating Ulysses JACKSON for a violation of U.S.C. §§ 922(g)(1) (possession of a firearm by a prohibited person) ("**SUBJECT OFFENSE**"). I submit this affidavit in support of applications for two search warrants:

   a. The <u>first</u> warrant would authorize the search of two cellphones ("**SUBJECT TELEPHONES**"), further described in Attachment A-1 and in the custody of the ATF Baltimore Field Office in Baltimore, Maryland.

      i. A black Apple iPhone bearing IMEI# 352987092360439 and FCCID# BCG-E3091A

      ii. An LG cellphone bearing IMEI# 89014103272480337167

2. I submit that there is probable cause to believe that the **SUBJECT TELEPHONES** contains evidence, fruits, and instrumentalities of the crime of possession of a firearm by a

prohibited person in violation of 18 U.S.C. § 922(g)(1).  The search warrant would authorize members of the ATF, or their authorized representatives including other law enforcement agents assisting in the above-described investigation, to examine the **SUBJECT TELEPHONES** for the purpose of seizing electronically stored data described in Attachment B-1.

    b.  The <u>second</u> warrant would authorize members of the ATF, or their authorized representatives, to obtain samples of Deoxyribonucleic Acid ("DNA") for comparison purposes in the form of saliva from JACKSON, a man born in 1982, assigned an FBI number ending in 6NB7, and assigned a Social Security account number ending in 4838.  A photograph of JACKSON is attached as Attachment A-2. JACKSON is incarcerated at the Baltimore Central Booking and Intake Facility, 300 E. Madison St., Baltimore, Maryland 21202. The warrant would authorize members of the ATF, or their authorized representatives, including but not limited to other law enforcement agents assisting in the above-described investigation, to obtain DNA contained within saliva samples from JACKSON, as described in Attachment B-2.

    3.  I submit this affidavit for the limited purpose of establishing probable cause for a search warrant.  I have not included every fact known to me concerning this investigation to date. Rather, I set forth only those facts I believe are necessary to establish probable cause.  I have not, however, excluded any information known to me that would defeat a determination of probable cause.  The information set forth in this affidavit derives from my personal knowledge and observations; discussions with other law enforcement officers and witnesses; and my review of police reports and public records.  All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

    4.  Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violation of the **SUBJECT OFFENSE** has occurred. I also believe

that probable cause exists to search the **SUBJECT TELEPHONES**, particularly the information described in Attachment A-1, for evidence of this crime and the items to be seized listed in Attachment B-1. I further believe that evidence of the aforementioned criminal violation is contained in the form of DNA in saliva in the possession of JACKSON.

## II.   AFFIANT BACKGROUND

5.   I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

6.   I have been a Special Agent with ATF since 2020 and am currently assigned to the ATF Baltimore Field Division, Group III. I attended the Department of Homeland Security's Criminal Investigator Training Program and ATF's Special Agent Basic Training for a combined period of 26 weeks. I served as a federal police officer with the Supreme Court of the United States Police Department in Washington D.C for approximately six years before working for ATF.

7.   I am currently participating in investigations concerning the illegal possession of firearms, controlled substance laws, and the commission of violent crimes by organized gangs.  I received specialized training and personally participated in various types of investigative activities, including, but not limited to: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge of firearms and controlled substance laws; (c) code words and phrases used by criminals when referencing firearms and narcotics; (c) undercover operations; (d) the execution of search warrants; (e) the consensual monitoring and recording of conversations; (f) electronic surveillance through the use of pen registers and trap and trace devices; and (g) the handling and maintenance of evidence; and (i) Title III investigations.

### III. AFFIANT EXPERTISE

8. Based on my training and EXPERIENCE, I know the following about persons engaged in unlawful firearms possession and firearms trafficking and the use of cellphones in furtherance of these activities:

9. The fruits and instrumentalities of criminal activity are often concealed in digital form. Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity, like firearms. The **SUBJECT TELEPHONES** have both digital storage capacity and digital camera capabilities.

10. Criminals often place nominal control and ownership of telephones and other electronic devices in names other that their own to avoid detection of those telephones by government agencies. Even though these are in the names of other people, criminals retain actual ownership, control, and use of the telephone and/or device, exercising dominion and control over them.

11. Criminals often use different types of communication devices and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel.

12. Cellular phones and other electronic devices capable of sending and/or receiving communications associated with criminals include various types of evidence. Phones may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information.

13. Criminals who engage in criminal activity with others take photos of themselves with high-end consumer items, like cars or watches and other items they acquired during the crime.

These "trophy" photos are often maintained on cellular telephones and electronic devices to be shared on social media, or as symbols of their success.

14.    Persons prohibited from possessing firearms will often utilize unlawful means of obtaining them such as burglary, theft, or trading them for narcotics. Information surrounding the unlawful transfer of firearms and their prohibited possession is often memorialized within the possessor's cell phone.

15.    Cellular telephones may contain location information that indicate where a user of the cellphone was located before, during and after a crime has occurred.

16.    The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be of evidentiary value as it may confirm that a particular cell phone and/or electronic device is the phone identified during a wiretap, pen register, or other electronic investigation.

17.    I also know, based on training and experience, that DNA can be found on items such as clothing and firearms, and can be compared to a sample of DNA from a known person. This comparison can help identify or eliminate suspects. I know that the Baltimore Police Department Forensics Biology Unit will not test firearms for the presence of DNA (or any subsequent comparison) without a standard to which it can be compared.

**IV.    PROBABLE CAUSE**

18.    On August 6, 2021, at approximately 10:30 p.m., a Baltimore Police Department (BPD) detective was conducting covert surveillance of the Marathon Gas Station located at 909 Dundalk Avenue, Baltimore, Maryland in reference to recent complaints of criminal activity. The detective observed a Black male—later identified as Ulysses JACKSON—exit the driver's side door of a dark colored Chevrolet SUV, which was parked at one of the gas station pumps.  Around

this same time, an individual known to the detective as "X" was walking around the gas station asking for "girl." Based on his training and experience, the detective knew that "girl" is a common street term for crack cocaine.

19. The detective watched as JACKSON walked to the rear driver's side of the vehicle and met with "X". After a brief conversation, the detective observed "X" hand JACKSON cash in exchange for a small item consistent with the size of CDS commonly packaged and sold in the area. The detective then watched as "X" immediately placed his left hand to his nose and appeared to snort the contents of the item. JACKSON then reentered the vehicle and departed from the Marathon Gas Station parking lot.

20. After observing what the detective believed to be a hand-to-hand drug transaction, he signaled for additional BPD officers to conduct a traffic stop on JACKSON's vehicle. While operating a marked patrol vehicle and utilizing their equipped lights and sirens, officers attempted to stop the vehicle in the 6600 block of Eastern Avenue. As officers approached the vehicle on foot, JACKSON fled the area and continued to drive along Eastern Avenue. Officers attempted to keep the vehicle in view and requested air support from Foxtrot.

21. JACKSON continued to flee from officers until he approached the intersection of Graceland and Dundalk Avenues. There, he exited the vehicle and continued to flee on foot. As JACKSON was running, officers observed him grabbing his front waistband area, continuously turning around to check the location of officers, and running with an unnatural limp while holding his left arm tight to his body. As officers were exiting their vehicle to continue the pursuit on foot, they observed JACKSON holding what they believed to be a firearm as he entered the rear alley of the 1100 block of Dundalk Avenue. Officers apprehended JACKSON in the alley after a brief pursuit.

22. BPD officers immediately began a canvass of the area and, after approximately thirty minutes, they recovered a .40 caliber firearm magazine loaded with 14 rounds of live .40 caliber ammunition lying on the top of a ladder in the rear yard of 1148 Dundalk Avenue. Officers also recovered a black Polymer 80 .40 caliber pistol from underneath the same ladder. The officers observed fresh dirt inside the barrel of the pistol and on the front sight post. They also observed markings on the rear of the slide and grip of the firearm which, in their training and experience, was consistent with the pistol being thrown and striking a hard object.

23. After JACKSON was apprehended, he admitted to ingesting a large quantity of narcotics and requested medical assistance. Before he was transported to the hospital, officers searched JACKSON and recovered 19 blue jugs containing suspected cocaine. Officers also recovered the **SUBJECT TELEPHONES** during the arrest. Shortly after his arrest, JACKSON placed a consensually-recorded jail call in which he acknowledged that the officers seized his two cellphones.

24. All recovered evidence was submitted to the Evidence Control Unit of BPD.

25. I have reviewed JACKSON's criminal record and learned that in 2015 he was convicted of unlawfully transporting a firearm by the District Court for the District of Maryland and sentenced to six years and two months in prison and is currently on federal supervised release. Therefore, JACKSON is prohibited from possessing firearms and ammunition pursuant to 18 U.S.C. § 922(g)(1). Moreover, based on this prior conviction, I believe JACKSON was aware that he had previously been convicted of a crime punishable by more than one year in prison.

26. I have reviewed the information regarding the ammunition recovered and believe that it is ammunition as it is defined under federal law. I further believe that the ammunition was

manufactured outside the state of Maryland and therefore, the ammunition affected interstate commerce prior to its recovery in Maryland on August 6, 2021.

27.    The Polymer 80 was test-fired by the BPD lab's firearm section. The firearm was able to successfully expel a projectile through the action of an explosive and therefore satisfies the definition of a firearm under 18 U.S.C § 921.

V.    **FORENSIC ANALYSIS OF ELECTRONIC COMMUNICATIONS DEVICES**

28.    Based on my training, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. There is probable cause to believe that things that were once stored on the **SUBJECT TELEPHONES** may still be stored on those devices, for various reasons, as discussed in the following paragraphs.

29.    As further described in Attachment B-1, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT TELEPHONES** were used, the purpose of its use, who used it, and when.

30.    There is probable cause to believe that this forensic electronic evidence might be stored within the **SUBJECT TELEPHONES** because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online

nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

31. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

32. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

33. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

34. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion

onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

36.     Additionally, the known specifics for the **SUBJECT TELEPHONES** are detailed in Attachment A-1 and the types of information expected to be recovered from the devices are listed in Attachment B-1.

### VI.    CONCLUSION

37.     Wherefore, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the **SUBJECT TELEPHONES** and authorize the search for the information set forth in Attachment B-1, where applicable, which constitute fruits, evidence, and instrumentalities of possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g).

### DNA AUTHORIZATION REQUEST

38.     Based on my training and experience, I believe that JACKSON's DNA will be on the firearm recovered during his arrest. A known sample of his DNA is required in order to test and compare any and all DNA recovered. Accordingly, I am requesting authorization for a warrant to obtain samples of DNA for comparison purposes in the form of saliva from JACKSON to compare to the swabs taken from the firearm that I believe was possessed by JACKSON in violation of 18 U.S.C. § 922(g)(1) (possession of a firearm by a prohibited person).

39.     Further, I respectfully request that the Court issue a warrant authorizing members of the ATF, or their authorized representatives, including but not limited to other law enforcement agents, to obtain DNA samples from JACKSON so that the DNA sample may be compared to the swabs taken from evidence recovered in this case.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____
Special Agent Anthony Petrella
Bureau of Alcohol, Tobacco, Firearms and Explosives

(Digitally signed by ANTHONY PETRELLA, Date: 2021.10.13 16:06:01 -04'00')

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on October 20, 2021.

_____
Hon. Thomas M. DiGiralomo
United States Magistrate Judge

# ATTACHMENT A-1
## Devices to be Searched

a. A black Apple iPhone bearing IMEI# 352987092360439 and FCCID# BCG-E3091A ("**SUBJECT TELEPHONE 1**")

b. An LG cellphone bearing IMEI# 89014103272480337167 ("**SUBJECT TELEPHONE 2**")

# ATTACHMENT A-2
## Photograph of Person to be Searched

Ulysses JACKSON
YOB: 1982
Currently residing at: Baltimore Central Booking and Intake Facility, 300 E. Madison St.
Baltimore, Maryland 21202
Last four digits of FBI No.: 6NB7
Last four digits of SNN: 4838



2

## ATTACHMENT B-1
### Items to be Seized

All records contained in the **SUBJECT TELEPHONES** (described in Attachment A-1), which constitute evidence of violations of 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) including the following items, as outlined below:

1. Contact logs that refer or relate to the user of any and all numbers on the **SUBJECT TELEPHONES**.

2. Call logs reflecting date and time of received calls.

3. Any and all digital images and videos of persons associated with this investigation.

4. Text messages to and from the **SUBJECT TELEPHONES** that refer or relate to the crimes under investigation.

5. Records of incoming and outgoing voice communications that refer or relate to the crimes under investigation.

6. Voicemails that refer or relate to the crimes under investigation.

7. Voice recordings that refer or relate to the crimes under investigation.

8. Any data reflecting the phone's location.

9. Contact lists.

10. Any and all records related to the location of the user(s) of the devices.

11. Evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

12. evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

13. evidence of the lack of such malicious software;

14. evidence of the attachment to the **SUBJECT TELEPHONES** of other storage devices or similar containers for electronic evidence;

1

15. evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

16. evidence of the times the **SUBJECT TELEPHONES** were used;

17. passwords, encryption keys, and other access devices that may be necessary to access the **SUBJECT TELEPHONES**;

18. documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the **SUBJECT TELEPHONES**;

19. contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

1. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

2. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3. "scanning" storage areas to discover and possible recover recently deleted files;

4. "scanning" storage areas for deliberately hidden files; or

5. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.

## ATTACHMENT B-2
**Description of Items to be Seized**

Buccal (oral) swabs of the inside of Ulysses JACKSON's mouth limited to the extent where sufficient samples of DNA are obtained.